**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-2573

THE ESTATE OF DENNY LOVERN
by and through its personal representative Darla Dailey;
DARLA DAILEY, individually

       Plaintiff,

v.

CORRECT CARE SOLUTIONS, LLC;
BOARD OF COUNTY COMMISSIONERS FOR THE COUNTY OF ARAPAHOE, COLORADO;
DAVID WALCHER, in his official capacity as Arapahoe County Sheriff;
JENNA WALTER, RN, individually;
HEIDI LANTZ, LPN, individually;
CHERYL THOMPSON, RN individually;

       Defendants.

_____

**COMPLAINT AND JURY DEMAND**
_____

       Plaintiffs, by and through their attorneys, complain against Defendants and request a trial by jury as follows:

**I. <u>INTRODUCTION</u>**

       1.    Denny Lovern was a 59-year-old inmate at the Arapahoe County Detention Facility, who died on April 8, 2017 as a result of Defendants' deliberate indifference to his known serious medical needs.

       2.    After refusing to give Mr. Lovern his prescribed heart medications, nursing staff then ignored obvious emergency symptoms in the following days before his death, including his documented reports that he was having chest pains and experiencing a "heart attack."

3.      As Mr. Lovern's health deteriorated, nurses did nothing. They did not call a doctor. They did not send him to a hospital. Instead, they put Mr. Lovern in a medical "observation" cell, where no observation or medical treatment was provided.

4.      Despite Mr. Lovern's and other inmates' repeated requests for help, Mr. Lovern's obvious and treatable cardiac emergency went entirely untreated.

5.      Left to wither in his cell, and presumed to be faking or malingering, Mr. Lovern collapsed and died on the floor of his cell surrounded by his own blood and vomit just five days after he was admitted to the jail.

## II.  JURISDICTION AND VENUE

6.      This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and 42 U.S.C. § 1983 and 42 U.S.C. §1988.  The Jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201.

7.      This case is instituted in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

8.      Supplemental pendent jurisdiction is based on 28 U.S.C. §1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

9.      The state law claims in this matter are brought against private corporations and therefore no notice of claims was required under the Colorado Governmental Immunity Act.

## III.  PARTIES

10.     At all times relevant hereto, the decedent, Denny Lovern, was a resident of the State of Colorado and a citizen of the United States of America.

11.     At all times relevant hereto, Plaintiff Darla Dailey was a resident of the State of Colorado and a citizen of the United States of America.  Plaintiff Darla Dailey is the daughter of the decedent Denny Lovern and the Personal Representative of the Estate.

12.     Defendant Correct Care Solutions, LLC ("CCS") is a Tennessee corporation doing business in the State of Colorado, with its principal street address located at 1283 Murfreesboro Road, Suite 500, Nashville, TN 37217.  Its registered agent of service in Colorado is located at 3773 Cherry Creek North Drive #575, Denver, CO 80209.  Correct Care Solutions, LLC acquired Correctional Healthcare Companies, Inc. in 2014.

13.     Defendant CCS is a proper entity to be sued under 42 U.S.C. § 1983 for its deliberately indifferent policies, practices, habits, customs, procedures, training and supervision of staff, including of CCS Individual Defendants, with respect to the provision of medical care and treatment for inmates at the Arapahoe County Detention Facility. Defendant CCS was acting under color of state law and performing a central function of the state.

14.     Defendant CCS is sued vicariously for the negligence of its employees and directly for its own negligent training and supervision of staff working at ACDF.  Defendant CCS is a private corporation not entitled to immunity under the Colorado Governmental Immunity Act.

15.     The Defendant Board of County Commissioners for the County of Arapahoe, Colorado a/k/a "Arapahoe County" (hereinafter "BOCC") is a governmental entity chartered under the laws of the State of Colorado. Defendant BOCC represents, oversees, and sets policy

for Arapahoe County Colorado. Among other things, Arapahoe County operates the Arapahoe County Detention Center (hereinafter ACDF), located at 7375 S. Potomac St., Centennial CO, 80112. Defendant BOCC also contracted with Defendant CCS to provide health care to the inmates at the ACDF. Under COLO. REV. STAT. § 30-11-105, the BOCC is the proper party in an action against Arapahoe County.

16.     Defendant David Walcher, in his official capacity, is the Arapahoe County Sheriff and a final policymaker for Arapahoe County with respect to all matters concerning the Arapahoe County Sheriff's office and all of its divisions, including the ACDF.

17.     Defendant BOCC and Defendant Walcher are hereinafter collectively referred to as the "Arapahoe County Defendants."

18.     Arapahoe County Defendants are sued under 42 U.S.C. § 1983 with respect to the challenged deliberately indifferent policies and practices for the care and treatment of persons detained at the ACDF. These Defendants are liable under the non-delegable duty doctrine for CCS's challenged deliberately indifferent policies and practices related to the medical care and treatment of persons detained at ACDF.

19.     At all times relevant hereto, Defendant Jenna Walter, RN, was a citizen of the United States and a resident of Colorado. Defendant Walter was employed by Defendant CCS and acting under color of state law.

20.     At all times relevant hereto, Defendant Heidi Lantz, LPN, was a citizen of the United States and a resident of Colorado. Defendant Lantz was employed by Defendant CCS and acting under color of state law.

21.     At all times relevant hereto, Defendant Cheryl Thompson, RN was a citizen of the

United States and a resident of Colorado. Defendant Thompson was employed by Defendant CCS and acting under color of state law.

22.     These nurse Defendants sued in their individual capacities are collectively referred to as the "Individual Defendants."

### IV.  STATEMENT OF FACTS

23.     Mr. Lovern was incarcerated at ACDF on April 3, 2017.

24.     Upon entry into the facility, he had an extensive medical history of cardiac-related conditions, including previous heart attacks and stent-placement surgery.

25.     This medical history was well documented and known to medical staff at ACDF.

26.     ACDF's booking nurse noted on Mr. Lovern's intake sheets that he told her he had "heart issues," that he "last had a heart attack when he was here a year ago," and that he has had 4 stents placed."

27.     Mr. Lovern also told the booking nurse he had Hepatitis C, chronic pelvic pain, and a herniated slipped disc in his back.

28.     Among other prescription medications he was taking when incarcerated on April 3, 2017, Mr. Lovern was taking Plavix—a critically important drug for patients with heart problems.

29.     Mr. Lovern's heart stents are kept functional by his prescribed Plavix, which keeps blood from being deposited within the stents, thereby maintaining blood flow.

30.     Any reasonably trained health care professional knows that it is very dangerous to take away a patient's prescribed heart medication and that failure to timely provide it can cause serious physical injury, including death.

31.     Mr. Lovern was not administered his prescribed Plavix for several days, however, because ACDF did not have or promptly secure his necessary prescribed medication.

32.     On April 4, 2017, a booking nurse charted that Mr. Lovern was "very concerned of pain management while he is at our facility." While noting that Mr. Lovern had verified prescriptions for "tramadol, Neurontin, and flexeril," the nurse told him that jail policies did not allow for such medications.

33.     This booking nurse told Mr. Lovern to put in a written medical request ("KITE") and stated that she would speak to a provider regarding any medication orders.

34.     On April 5, 2017, Mr. Lovern submitted a KITE as instructed, stating: "I am requesting to see the doctor regarding my acid reflux problem, and discuss my need for the medication I am prescribed by my primary care doctors."

35.     He also requested "an extra blanket for elevation due to extreme acid reflux problem."

36.     All reasonable health care professionals know that extreme acid reflux complaints are red flags for serious cardiac problems in a patient with Mr. Lovern's history.

37.     On April 5 and 6, 2017, Mr. Lovern complained to and clashed with medical staff several times over his desire to be given his necessary prescription medications.

38.     Staff described Mr. Lovern as "easily agitated and verbally aggressive." He likely was agitated because he wasn't being cared for at the jail and he was in pain.

39.     On the evening of April 6, 2017, Mr. Lovern was experiencing severe chest pain.

40.     Mr. Lovern told ACDF deputies that he thought he was having a heart attack.

41.     The deputies called medical staff, and CCS nurse Heidi Lantz, LPN, responded to

Mr. Lovern's pod.

42.     Defendant Lantz charted that Mr. Lovern told her that he "was feeling as though he may be having a 'heart attack.'" Mr. Lovern also complained of a "burning from his stomach up to his chest and that he threw up all of his HS meds."

43.     He also told her he was vomiting yellow green bile.

44.     Given his known prior heart attacks and prior cardiac history, all reasonable health care professionals recognize these complaints are potentially life threatening and require immediate evaluation by a medical provider.

45.     Mr. Lovern's cellmate, David Bewsee, also could see that Mr. Lovern was clearly very sick and needed emergency medical care.

46.     Defendant Lantz reported that she gave Mr. Lovern Maalox, which he promptly threw up two minutes later.

47.     According to Nurse Lantz's notes, when Mr. Lovern complained about not getting his prescription medications, she responded that even if she had given him these prescribed medications, it was unlikely to "make everything better."

48.     Despite Mr. Lovern's complaint of feeling like he was having a heart attack, Defendant Lantz, an LPN, opened a Gastrointestinal Complaint Nursing protocol and did not call a doctor to report this serious complaint.

49.     In concluding on her own that Mr. Laintz – a man with a number of prior heart attacks – had a gastrointestinal problem and not a cardiac problem, Defendant Lantz practiced recklessly outside her licensure scope.

50.     Defendant Lantz also marked down that Mr. Lovern was having a "chronic,"

rather than a "new onset" complaint, despite his new symptoms of repeated throwing up and the life and death concern that he was then having a heart attack.

51.    On April 6, 2017, Mr. Lovern was placed in the medical unit for "overnight observation," yet no observation actually took place.

52.    He was transported by wheelchair to the medical unit.

53.    CCS staff instead left Mr. Lovern in a cell and did nothing to figure out or assess the reason he was vomiting, had chest pains, and thought he was having a heart attack.

54.    No CCS nurse called a doctor or other provider.

55.    No CCS nurse performed an EKG, a readily available and easy-to-conduct medical exam in the jail that would likely have made plain the seriousness of Mr. Lovern's heart related medical crisis.

56.    No vitals were taken.

57.    There are no actual medical notes from this so-called observation period. There is nothing whatsoever in Defendants' records suggesting that staff conducted even a single assessment of Mr. Lovern, let alone any testing.

58.    While there are no nursing notes from Mr. Lovern's time in the Medical Unit, it appears from the Sheriff Investigation that Defendant Nurse Jenna Walter was the RN working in the Unit during this time period.

59.    Defendant Nurse Walter was interviewed by the Arapahoe County Investigator about the care and treatment of Mr. Lovern. Nurse Walter admitted that she ignored and discounted these obvious symptoms of a man in medical crisis because "Lovern was checked out and it was determined that he was having gastro-esophageal issues." She further stated that

medical staff did not conduct an EKG "because his vitals and his symptoms did not present as a heart problem, but rather issues with his prior esophageal problems."

60.     While claiming to investigators after Mr. Lovern's death that his vitals were normal, there are no records of any vitals being taken by Nurse Walter or any other nurse.

61.     Moreover, Nurse Walter knows that she is not qualified to determine whether an inmate's reports of a heart attack accompanied by chest pain, weakness, and vomiting, is caused by a heart attack or reflux or any other cause. She knows that not calling a doctor, but instead choosing to rule out a heart attack and diagnose Mr. Lovern with esophageal problems on her own, risks serious injury and death.

62.     Defendant Walter knowingly practiced  outside her nursing scope in concluding that Mr. Lovern was faking or exaggerating his symptoms, or that his chest pains were caused by reflux rather than a heart problem.

63.     Although CCS nursing staff obviously did not believe Mr. Lovern that he was actually having a heart attack or suffering from an emergent medical condition, video footage of Mr. Lovern from the medical unit on April 6 and 7, 2017 shows that Mr. Lovern looked very sick.  He moved very slowly, appeared weak, and was restless and vomiting.

64.     The next morning, having not done any observation, not taken any vital-sign-measurements, not performed an EKG test, and not called a doctor, CCS staff transferred Mr. Lovern back to his general population pod.

65.     Mr. Lovern, an ambulatory man normally, started to walk with deputies back to his cell, but was still so sick and weak that he had to lean on the wall to stand up. Deputies brought him a wheelchair to take him back to his pod from the Medical Unit.

66.     No assessment was made by the health care team whatsoever as to why this ambulatory man needed a wheelchair.

67.     Having received exactly zero medical care during the night, Mr. Lovern was still very sick, and getting sicker.

68.     Upon returning to his cell, cellmate Bewsee observed him to be very weak and continuing to vomit bile into his shirt.

69.     In addition to his cellmate, at least four other inmates who saw Mr. Lovern between April 6 and his death on April 8, 2017 -- Lloyd Henderson, Norvell Farley, Armando Torrez, and Jerome Campbell -- reported to investigators that he looked very ill and needed to be medically evaluated.

70.     Inmate Lloyd Henderson told Mr. Lovern that he looked pale and needed to go to the nurses to get checked out.

71.     Inmate Norvell Farley told investigators that he tried to get Mr. Lovern to eat his dinner, unsuccessfully.

72.     Jerome Campbell told investigators that Mr. Lovern looked pale, and was not talkative.

73.     On April 7, 2017, Mr. Lovern received his first dose of Plavix from Defendant CCS Nurse Cheryl Thompson.

74.     Defendant Thompson interacted with Mr. Lovern at least three separate times on the morning of April 7. He was obviously very sick during this time and continuing to ask jail and medical workers for help.

75.     Notwithstanding her awareness of the obviously deteriorating and emergent

condition of a man in the midst of a medical crisis, Defendant Thompson did nothing other than pass out medications and go about her routine business. She also did not call a provider, conduct and EKG test, or take any vitals.

76.     Throughout April 7 and into the early morning of April 8, 2017, Mr. Lovern grew sicker and sicker.

77.     Cellmate David Bewsee reported that Mr. Lovern "stayed laying down for the most part on his bunk between the ups and downs to puke."

78.     Mr. Lovern was vomiting in "15 minute intervals;" he was pale and sick-looking, weak, and had pain in his abdomen.

79.     He stopped eating.

80.     At times Mr. Lovern was too weak to make it to the toilet, and he used his shirt to catch the bile he was vomiting up.

81.     Mr. Bewsee watched and listened as Mr. Lovern continued to vomit greenish brown bile at regular intervals and ask for his medications, for tests to be done, and to be sent to the hospital.

82.     CCS nurses continued to recklessly dismiss Mr. Lovern's complaints and diagnose him as having "just normal heartburn."

83.     It is outside the scope and practice of nurses to diagnose or determine the cause of signs and symptoms. Nurses have a duty to convey any abnormal signs, symptoms or vitals, and complaints of chest pain or that an inmate feels he is having a heart attack to a provider who can diagnose the cause of such symptoms. All trained nurses know that failure to communicate abnormal findings and serious subjective complaints of a heart attack to a provider risks serious

injury or death.

84.     Nevertheless, all Individual Defendants knew of and disregarded the excessive risks associated with Mr. Lovern's life-treatening medical condition when they decided not to evaluate Mr. Lovern, take his vital signs, conduct a readily avaialbe EKG test, or obtain a higher level medical evaluation. They did so despite being expressly aware of Mr. Lovern's known serious medical needs, consciously disregarding a substantial risk of harm and death.

85.     At around 1:45 a.m. on April 8, 2017, Mr. Bewsee, frantically called deputies in the pod when Mr. Lovern collapsed on the toilet.

86.     Cellmate Bewsee checked Mr. Lovern for a pulse and did not find one.

87.     Deputies responded to the cell and found Mr. Lovern unresponsive, not breathing, and without a pulse.

88.     He died surrounded by his bloody vomit in the toilet, paper bags, towels, and his bed.

89.     Mr. Lovern suffered an untimely and extremely painful death.

90.     Mr. Lovern's daughter, Darla Dailey, is devastated by the untimely death of her father. The emotional trauma of knowing that her 59 year-old father was abandoned in a medical crisis and died an unnecessary and painful death, continues to haunt her.

**Facts related to CCS'S Unconstitutional Policies, Practices and Training**

91.     CCS controls all aspects of health care available to inmates. CCS maintained unconstitutional policies, customs and training that violate the Fourteenth and Eighth Amendments. This included: (1) a written contractual policy of deliberately indifferent low staffing and under-budgeting inmate medical care; (2) under-stocking or not timely securing

inmates' necessary prescription medications; (3) a custom of disregarding inmates' medical complaints as faked or exaggerated without ruling out serious medical conditions that could lead to substantial injury or death, and training regarding the same; (4) allowing nurses and EMTs to practice outside their licensure scope rather than having inmates be seen by higher level medical providers, in part to save money; and, (5) a widespread custom of disregarding or ignoring serious medical conditions.

92.     CCS Defendant is well aware of severe system-wide deficiencies that have caused and continue to cause significant harm to inmates at ACDF, yet they have failed to take reasonable measures to abate this impermissible risk of harm.

93.     Defendant CCS frequently enters into contractual arrangements that, at least in part for cost saving reasons, do not provide adequate nurse or physician staffing, or sufficient access to higher level medical provider time to meet Constitutional requirements for care.

94.     Prior to CCS taking over the entire medical contract for ACDF in 2015, there was a significant staffing problem, resulting in far too few nurses in the medical area to provide constitutionally adequate care to the inmate population.  Frequently there would be one nurse on duty responsible for the entire behavioral unit, the entire medical unit, and to respond to any emergencies elsewhere in the jail. This could be a one nurse to 30-inmate ratio.

95.     As a result of this understaffing, inmates with serious medical needs did not get meaningful evaluations or nursing assessments, even when housed in medical.

96.     Since the take over by CCS of the entire medical unit in 2015, this understaffing problem became even worse. On information and belief, once CCS took over the contract for all nursing staff, they did away with the use of temporary nurses from staffing agencies, making it

even harder to fill shifts and causing even lower staffing to meet inmate's medical needs.

97.     CCS also stopped using a rotating on call doctor schedule for nurse calls, requiring the Medical Director and/or the jail provider to take all nurse calls in addition to their regular hours working at the jail.

98.     Low staffing in the medical unit causes care problems because it often means that nurses do not have time to review a patient's recent medical history, even though all health care workers know that history is critically important to understanding a patient's condition and arranging for appropriate and timely medical treatment.  Low staffing also prevents people from timely responding to inmates with serious medical needs.

99.     At the time of Mr. Lovern's death, there was not sufficient health care staff to timely respond to inmates' requests for medical evaluations and treatment; to adequately screen, monitor, and provide follow-up care to inmates who are suffering from serious and chronic illnesses; or to treat inmates on an emergency basis.

100.    These nursing and provider staffing problems contributed to the utter lack of medical intervention and provider assessment for Denny Lovern. Mr. Lovern was warehoused in the medical unit at Arapahoe, he was not checked on, his vitals were not taken, he was not given an EKG, and his chest pain was never evaluated by any qualified professional.

101.    Additionally, as part of the health services contract with Arapahoe County, CCS agreed to pay the costs of outside medical care (such as transportation, hospital visits, and other costs) until it reached a certain point or "cap," which was set at $250,000.

102.    If outside medical care exceeded the cap, then Arapahoe County would be responsible for amounts above the cap. If, on the other hand, CHC beat the cap, then they would

get to keep the difference between the outside medical care costs and the cap as profit. This same cap system was in place for prescription medications.

103.    The cap system created a financial disincentive to provide the constitutionally required medical care. Because of this financial disincentive, on information and belief, CCS budgeted extremely low amounts for outside medical care and for prescription medications, which resulted in a pattern and practice of denying medical care to inmates, such as not taking them to the hospital and not giving them needed medications, as here.

104.    Had Mr. Lovern been given his needed heart medications, he would likely not have had this heart attack.

105.    Had a qualified medical provider evaluated Mr. Lovern, his heart problems would have been detected and he likely would not have died.

106.    These budgetary limits also incentivize the company to foster the widespread customs in place of summarily disregarding subjective complaints and using nurses to diagnose.

107.    In addition to their understaffing and underfunding at ACDF, this County and this medical team also have a history, pattern, practice and custom of disregarding inmates subjective complaints as faked or not serious, allowing nurses to diagnose outside of their scope and to determine on their own what abnormal signs or serious complaints to relay to medical providers, and adopting a reckless wait and see approach to serious medical complaints.

108.    Without the benefit of formal discovery, undersigned counsel is already aware of at least one other inmate at ACDF who died because he was denied timely medical care and emergency treatment when nurses disregarded serious complaints and practiced outside of their licensing scope, just as they did with Mr. Lovern. Jeffrey Lillis died on December 14, 2014 of

treatable sepsis and bacterial pneumonia, which went untreated for days until it killed him. ACDF nurses diagnosed Mr. Lillis as having a viral illness outside the scope of their licensure, and assumed that Mr. Lillis was faking or exaggerating his serious symptoms. They discounted Mr. Lillis's days-long ordeal of high fever, head and body aches, abnormal vitals, and bloody cough. Instead, they offered Mr. Lillis Tylenol and Gatorade, things they knew could not actually treat any underlying medical condition. Even the cough suppressant that was ordered for him was not provided because it was unavailable in the jail. Like Mr. Lovern, they watched Mr. Lillis get sicker and sicker until he fell off the toilet, and died on the floor of his cell. At the time of Mr. Lillis' death, CCS controlled the providers for ACDF and the Medical Director.  On information and belief, when CCS took over the nursing team as well a few months later, the nursing team stayed largely intact. CCS was well aware of this culture and these practices, which were maintained after the full CCS takeover.

109.    After Mr. Lillis' death in the Medical Unit at ACDF in December 2014, Dr. Winslow, CCS Medical Director, recommended changing the policy to require that he or another mid-level provider initiate rounds in the Medical Unit to personally see any patient who has been brought to the unit from general population. This change was either not implemented or was ignored in this case as no doctor or mid-level provider ever came to see Mr. Lovern when he was brought into medical from general population.

110.    There is also an abundance of examples in Colorado, and nationwide, establishing that Defendant CCS and its predecessor CHC are deliberately indifferent in their policies, customs, and practices with respect to the medical needs of inmates, including disregarding serious complaints as faked, using nurses to diagnose outside their scope, refusing or delaying

provision of medications, and failing to provide timely treatment to medical conditions, causing serious injury or death across various illnesses. The following list of examples includes both cardiac and other medical problems that were treated with deliberate indifference, and is not remotely exhaustive.

111.   On December 14, 2014, the same day that Mr. Lillis died, a jury awarded an approximately $11 million dollar verdict against CHC related Defendants for failing to provide timely medical care to an inmate in Jefferson County who was having a stroke. Nurses disregarded Mr. McGill's obvious serious symptoms as not real, didn't even call a doctor, and he was abandoned while in the throes of a stroke for hours. The jury found that this company had a pattern and practice of not providing timely medical care and allowing nurses to practice outside their scope in treating inmates, and awarded millions of dollars in punitive damages for these deliberately indifferent customs and policies. See *McGill v. Correctional Healthcare Companies, Inc. et al.*, Case No. 13-cv-1080-RBJ-BNB (D. Colo.). Much like the *McGill* case, CCS nurses here just didn't believe Mr. Lovern's condition was serious or credit his experience-based assertion that he was having a heart attack. They again improperly practiced outside their nursing scope and diagnosed him with only having issues connected to acid-reflux, without calling a provider. Just like *McGill*, nursing staff put Mr. Lovern in a cell for "observation," yet did no actual medical observation, and instead deprived him of necessary emergent care.

112.   In April of 2014, CCS/CHC related Defendants unconstitutionally caused the death of John Patrick Walter at the Fremont County Detention Center in Colorado by ignoring his obvious and serious medical condition. Involved staff disregarded his known malnourishment and dehydration, withdrawal related conditions, and refused to transport him to the hospital for

emergency medical evaluation. Like Mr. Lovern, Mr. Walter also ultimately died on the floor of his cell after workers decided not to get higher-level medical care. That case also involved a contract between CHC Defendants and the County that incentivized and caused deliberately indifferent care. Just like Mr. Lovern, CHC has a pattern and practice of denying needed prescription medications to inmates because of the cost of such medications at the Fremont County Jail. The District Court denied Summary Judgment of the *Monell* claims because there were genuine issues of material facts regarding the role of the policies and practices of CHC in Mr. Walter's death. Mr. Walter's case is scheduled for trial in November 2018. *Estate of Walter by & through Klodnicki v. Corr. Healthcare Companies, Inc.,* 2018 WL 2414865, (D. Colo. May 29, 2018).

113.    In 2013, Rashod McNulty died while incarcerated in the Westchester County jail in New York, a jail whose medical care was provided by CCS and/or a related subsidiary. Like Mr. Lovern, Mr. McNulty complained of chest pain. After a cursory assessment, involved nurses called the on call doctor and the doctor concluded without any medical assessment that Mr. McNulty had indigestion. Mr. McNulty was kept for observation during which time he continued to complain of chest pain and tell jail staff that he did not want to die. Like here, involved nurses concluded that Mr. McNulty no longer needed observation and they took him back to his cell by wheelchair. The nurse taking him back to his cell told him that complaining of chest pain was one of the "oldest trick[s] in the book" and that she had "been doing this too long to be tricked."

114.    Mr. McNulty, like Mr. Lovern, complained of chest and abdominal pain to medical staff. Like Mr. Lovern, nursing staff chose not to observe or evaluate him despite

continued complaints. Mr. McNulty, like Mr. Lovern, died in his cell of a heart attack after being summarily kicked out of observation without any treatment for his serious medical condition. Like Mr. Lovern, had this inmate's obvious cardiac emergency been treated as such, his death could have been prevented.

115.    The New York State Commission of Correction found that "the emergency medical care provided to McNulty by the nursing staff" was "grossly uncoordinated and mismanaged … McNulty's signs and symptoms, all highly indicative of acute coronary syndrome, were dismissed by nursing staff." The report recommended that an investigation be conducted for professional misconduct of the involved nurses "for practicing with gross incompetence by failing to recognize obvious cardiac symptoms in the course of nursing care of Rashad McNulty, failing to maintain proper medical records, and for abandoning a patient in obvious distress." The state Commission of Correction urged state licensing authorities to investigate the nurses after finding they missed "obvious cardiac symptoms" and failed to maintain proper medical records. The Medical Review Board opined that the doctor "made a dangerous presumptive diagnosis of abdominal distress based only on a phone report from a nurse and failed to order any other requisite diagnostic tests or request immediate transport to a hospital to rule out acute coronary syndrome."  A video recently was made public showing correctional officers and medical workers declining to take Mr. McNulty to the infirmary when he collapsed on the floor complaining of chest pains.

116.    In June 2011, Donna Pillard died in a Nebraska jail whose medical care was handled by CCS.  Donna Pillard, like Mr. Lovern, had a significant history of cardiac issues and came into the jail with necessary cardiac medications. Ms. Pillard, like Mr. Lovern, was deprived

of her needed heart medications, contributing to her death.  The case settled with CCS in 2014 for an undisclosed confidential amount.

117.    Bruce Howard died in El Paso County Jail, whose medical care was provided by CHC, a predecessor to CCS.  Mr. Howard had a known history of heart problems and chemical dependence and presented to the jail with his needed medications, including heart medications. Just like Mr. Lovern, Mr. Howard was not given his needed medications, including his cardiac medications. Like Mr. Lovern, Mr. Howard became visibly ill and he and others complained to medical staff that he needed medical attention, yet he was not timely treated. Mr. Howard died in his cell of a cardiac arrhythmia. *Estate of Bruce R. Howard, et al. v. County of El Paso, Colorado et al.*, Case No. 10-cv-2740-CMA-MEH (D. Colo.). The case settled in front of Magistrate Judge Hegarty in 2011.

118.    In 2015, Scott Millward died in a Wyoming jail where the medical care was provided by CCS.  Mr. Millward was in the throes of an obvious  medical crisis from alcohol intoxication and withdrawal and also had critically high blood pressures.  Despite this crisis and abnormal vital signs, CCS staff ignored abnormal vitals, did not take other required vitals, and did not administer Mr. Millward his required medications or gave him insufficient doses.  Mr. Millward appeared in Court where even the judge noted that he did not look well. Staff continued to fail to take his vitals and Mr. Millward finally died in his cell. Mr. Millward's autopsy concluded that he died of cardiovascular disease, including hypertension, and that "lack of antecedent medical care" was a contributing factor in his death.   Just like Mr. Lovern, Mr. Millward was basically warehoused, not administered needed medication, not worked up despite serious symptoms and complaints, and instead was left to die in his cell.

119. Michael Morittz, 38 years old, died in 2006 in the Tulsa County Jail, whose medical care was provided by CHC, a predecessor to CCS. Mr. Morittz had a well-known and documented cardiac condition, which required life-sustaining medications. Like Mr. Lovern, Mr. Morittz asked repeatedly for his needed heart conditions but they were not given, nor was he ever evaluated by medical personnel qualified to diagnose and/or treat his condition. He finally died after his artificial heart valve stopped working and he developed an infection. The United States District Court for the Northern District of Oklahoma denied CHC/CCS related Defendants motions to dismiss on July 28, 2015. M*orittz v. Correctional Healthcare Companies, Inc., et al.*, Case No. 14-cv-656-GFK-PJC (N.D. Okla.). The case settled in late 2016 for an undisclosed confidential amount.

120. In *Revilla v. Stanley Glanz, Sheriff of Tulsa County, et al.*, Case No. 13-cv-315-JED-TLW (N.D. Okla.), several plaintiffs sued Defendant CHC, a predecessor to CCS, in connection with three deaths and one near fatality that occurred at the Tulsa County Jail. Like Mr. Lovern, a *Revilla* inmate died from a heart attack after complaints of chest pain were ignored for days without emergency transport. Another inmate, who had a known history of cardiovascular problems, died after complaints of pain, nausea, and vomiting were ignored and emergency transportation, was denied. It was alleged that "[t]here is a longstanding policy, practice or custom at the Jail of CCS/CHM/CHMO and TCSO [the jail] of refusing to send inmates with emergent needs to the hospital . . . ."

121. As with Mr. Lovern, in *Revilla*, there were deep-seated and well-known policies, practices and/or customs of systemic, dangerous and unconstitutional failures to provide adequate medical care to inmates at the jail. More particularly, CHC had a pattern and practice of

training and supervising its nurses to not provide inmates with serious medical conditions with even the most basic supervision or assessment, including a failure to promptly evaluate and properly monitor and inmate's physical health. These customs of not providing adequate or timely evaluation and treatment in the face of known and substantial risks led to inmates medical conditions deteriorating until they died in the jail.

122.   In *Revilla,* the United States District Court for the Northern District of Oklahoma denied CHC and related Defendants' Motions to Dismiss the §1983 *Monell* claim, holding *inter alia*, that Plaintiffs had plausibly alleged that "the deliberate indifference to each of the plaintiff's serious medical needs . . . was in furtherance of and consistent with . . . policies, customs, and/or practices" of CHC, which included "maintaining longstanding, systemic deficiencies in the medical and mental health care provided inmates at the Tulsa County Jail," and a "system of deficient care - - which evinces fundamental failures to train and supervise medical and detention personnel. . ." The judge in *Revilla* further found that Plaintiffs had plausibly alleged a direct causal link between CHC's maintenance of a systemic, dangerous, and unconstitutionally deficient medical care system, including a prevailing attitude among clinic staff of indifference, and the deaths and/or injuries to each of the plaintiffs.

123.   In denying CHC's motion to dismiss, the *Revilla* court also noted that CHC had notice from 2007-2011 "of findings, in audit reports by the National Commission on Correctional Health Care, the Oklahoma Department of Health, the United States Department of Homeland Security's Office of Civil Rights and Civil Liberties (CRCL), and the Jail's own medical auditor, which found significant problems with the system of medical care provided at the Jail." These findings include, relevantly hereto:

a.  On September 29, 2011, U.S. Immigration and Customs Enforcement ("ICE") and U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") reported their findings in connection with an audit of the Tulsa jail's medical system as follows: ***"CRCL found a prevailing attitude among clinic staff of indifference...."***; "*Nurses are undertrained*. Not documenting or evaluating patients properly."

b.  In 2010, during a NCCCS audit, high-level employees of CCS attempted to fraudulently change medical records to give the appearance of compliance. NCCCS found deficient care, deficient investigation into deaths, and a lack of timely diagnostic and specialty services.  Even after this audit, CCS did not take the corrective measures necessary to alleviate the obvious and substantial risks to inmate health. High-level CCS employees repeatedly brought to CCS's attention the many serious deficiencies, including chronic failures to triage medical requests, falsification of records, and refusals to treat inmates with life-threatening conditions, but the corporation refused to make any changes to the way CCS-related companies operated.

c.  In 2009, an Oklahoma Department of Health investigation indicated that such deficiencies by CCS-related companies continued unabated despite the abundant notice of the same from NCCCS and DOJ.

d.  In 2008, the Department of Justice found that the Tulsa jail medical program was constitutionally deficient in a number of regards. Specifically, the DOJ found problems in "providing appropriate access to medical care during emergencies" citing a case where a woman went into premature labor and delivered a baby while handcuffed to a chair rail. This happened after her complaints, including that her water had broken, were ignored.  The DOJ found that there were "critical lapses in getting emergency medical care to detainees."  The DOJ also noted that they had conducted a previous tour in 2003 and that, despite many years to remedy the violations found, "we generally did not observe improved conditions at the time of the second tour."

e.  In 2007, the National Commission on Correctional Health Care ("NCCCS") auditors reported serious and systemic deficiencies in the care provided to prisoners by CCS-related companies in the Tulsa jail, including failure to address health needs in a timely manner.

124.   The multiple plaintiff case which has been combined into the *Revilla* case has been extensively litigated for several years and is still pending.

125.   In *Lara-Williams/Burke v. Glanz, et al,* Case No. 11-cv-720, Earl Williams died

in his jail cell at the Tulsa County Jail from a treatable condition in 2011. Mr. Williams was not given timely medical treatment, despite the obvious and emergent need, was not properly monitored, and did not receive even the most basic and necessary medical assessments and treatment. Instead, like Mr. Lovern, medical staff dismissed Mr. Williams complaints as faked and watched him deteriorate. Mr. Williams became dehydrated and died alone on video in a cell from his injuries, including complications from a broken neck and dehydration, while staff watched him trying to reach his water. The *Williams* case settled with CHC related Defendants for a confidential undisclosed amount in February 2014 after several years of litigation. In 2017, the *Williams* case further resulted in a $10,000,000 verdict against the Sheriff in his official capacity.

126.    On March 1, 2015, 38-year-old Jennifer Lobato, a detainee housed in Jefferson County Detention Center died from a withdrawal related electrolyte imbalance on the concrete floor of her cell. Soon after entering the jail, Ms. Lobato began demonstrating clear signs of withdrawal from methadone. Ms. Lobato's condition continued to rapidly deteriorate until she was vomiting profusely. Rather than providing her with the timely medical attention and treatment she so desperately needed, Ms. Lobato was forced to clean up her own vomit and was, like Mr. Lovern, left to suffer an agonizing death in her cell from an entirely treatable condition. Like here, CHC/CCS Defendants had a financial incentive because of their contractual relationship with Jefferson County to continue to foster an environment of skepticism toward inmate complaints and a reckless wait and see approach to inmate care. Ms. Lobato's Estate claim was settled with Jefferson County for $2.5 million dollars and with CCS for a confidential amount.

127.    At the end of 2016, 84-year-old Marciano Briones died of a complications resulting from untreated gallbladder issues and related infections at Adams County Jail where CCS provided medical care. Like Mr. Lovern, jail and medical staff disregarded his known obvious deteriorating condition, despite complaints from him and other inmates, and he died.

128.    On June 3, 2013, Tonya Martinez, a pre-trial detainee housed at the Pueblo County Detention Facility died in a jail cell, from an alcohol withdrawal related seizure at the age of thirty-six. Ms. Martinez's preventable death occurred after she displayed obvious signs of a medical crisis, including shaking, nausea, vomiting, sweating, and rapid pulse. Among other acts and omissions of deliberate indifference, jail and medical staff failed to regularly monitor Ms. Martinez's condition, unconscionably delayed giving her medication, provided insufficient medication, failed to transport her to a hospital despite her obvious need for emergent care, and, just minutes before her death, ignored a call for medical to check on her. Just like Mr. Lovern, Ms. Martinez was denied her needed medications, maintained in the jail despite the obviousness that her condition required higher-level medical attention, and died.

129.    In 2016, 29 year-old Matthew McCain was found unresponsive in his cell in the Durham County Jail after CCS employees refused to treat his known serious medical conditions of diabetes and epilepsy. Like Mr. Lovern, CCS employees did not hospitalize or timely treat Mr. McCain and he died from a treatable condition on the floor of his jail cell. Several other inmates died in Durham under CCS's care, leading to several other lawsuits including for Jennifer McCormack who died of withdrawal related conditions, and Dennis McMurray who died of drug overdose.  Both Ms. McCormack and Mr. McMurray were refused hospitalization by jail medical staff. The National Commission on Correctional Health Care Accreditation

(NCCHC) evaluated the Durham jail in December 2015 just over a month before McCain died. A review found that the jail was not in compliance with four of the 38 "essential standards" of care.

130.     In *Chavez v. Correctional Healthcare Management, Inc. et al*, Case No. 11-cv-988-MSK-MEH, Martha Chavez suffered excruciating pain and permanent injuries as a result of withdrawing from her prescribed medications in the Larimer County Detention Center in 2009. CHC/CCS related Defendants refused to give Ms. Chavez her necessary medications and medical staff ignored her serious signs of opiate withdrawal. Like Mr. Lovern, pursuant to the policies and customs of CHC/CCS related Defendants, after refusing to provide prescribed medications, the nurses then were deliberately indifferent to an obviously serious medical condition and refused to provide timely and appropriate care. Ms. Chavez almost died and sustained serious and permanent physical injuries, including a brain injury. The case settled for an undisclosed amount in September 2012.

131.     In *Layton v. Correctional Healthcare Management of Oklahoma, Inc. et al,* Case No. 09-cv-1208-C (W.D. Okla.), an inmate died after he was found unresponsive in his jail cell in 2009. Like Mr. Lovern, medical staff employed by CCS ignored serious symptoms and denied necessary emergent medical care and hospitalization. Following the denial of a summary judgment motion, CHC related Defendants settled the claims against them for an undisclosed amount in 2011. The case went to trial against the County and the jury returned a verdict in the amount of $175,000.

132.     In 2013, Donnie Ray Brown died from a perforated ulcer in Coos County Jail in Oregon as result of the deliberately indifferent medical care he received by ConMed, a CCS

owned Defendant. Like Mr. Lovern, pursuant to their training and customs, despite pleas for help by Mr. Brown and other inmates, medical staff refused to hospitalize him or treat his known serious medical needs as emergent or real, stating that he was just trying to get out of jail early. Mr. Brown's ulcers had perforated through the wall of his duodenum causing peritonitis and death. Like Mr. Lovern, health care workers practiced outside their scope and Mr. Brown died of a preventable condition, which could have been treated if given medical care in a timely fashion. The Court denied summary judgment, finding that Mr. Brown was treated by an EMT who was not qualified to diagnose or treat his serious medical needs, and who made critical assessments of Brown that were beyond the scope of his EMT training, skill levels, and licensing. The Court also denied summary judgment on the entity claims finding that Conmed [the CCS subsidiary] failed to adequately staff the jail with qualified medical professionals and also that it ratified and endorsed the constitutionally inadequate medical care and understaffing at the jail. Just like Mr. Lovern, Mr. Brown died because a CCS company allowed reckless understaffing and tolerated a custom of using unqualified medical staff to diagnose outside of their scope of licensure. It appears that the case settled shortly after the summary judgment order for an undisclosed amount.

133.   In July 2013, 37-year-old Jennifer Meyers died in the Macomb County Jail in Michigan from a treatable infection, which developed into acute sepsis. Like Mr. Lovern, CCS medical staff refused to provide Mr. Meyers with timely or appropriate care, resulting in her deterioration and death in the jail while other inmates tried to help her. A federal civil rights case was filed in the United States District Court Eastern District of Michigan Southern Division, Case No. 16-cv-13504, in September 2016, which included §1983 entity claims against CHC for

their unconstitutional policies and practices of ignoring inmates serious medical needs. This case is still pending.

134.    In 2013, Christina Boshears died in the Kitsap County Jail in the state of Washington from withdrawal related conditions. Like Mr. Lovern, Ms. Boshears death could have been prevented with actual medical care, yet, pursuant to the unconstitutional customs and practices of CCS, medical staff mismanaged, ignored, and did not hospitalize and/or timely treat her deteriorating condition resulting in her death. The case was set for jury trial October 1, 2018 but was recently stipulated dismissed, indicating a settlement.

135.    Kitsap County Jail is located in Pierce County. Pierce County actually itself sued Correct Care Solutions (formerly Conmed) over their contract due to the number of deaths and grossly inadequate medical care provided at their jails. In the course of one year, in addition to Ms. Boshears' death, four inmates died in the Cowlitz County Jail between 2013 and 2014 while needing medical attention. One Pierce County inmate didn't get his medications and suffered two seizures and a fall that resulted in a traumatic brain injury and fractures to his eye sockets and wrist. Pierce County Deputy Prosecuting Attorney Grace Kingman stated that a jury likely would find Correct Care Solutions/Conmed was "incompetent, unprofessional and morally reprehensible."

136.    David Stojcevski, a 32-year old inmate in the Macomb County Jail in Michigan, died from acute drug withdrawal in 2014. Like Mr. Lovern, medical staff did not timely treat his serious condition resulting in his death in the jai.  Mr. Stojcevski's agonizing deterioration connected to withdrawal spanned over sixteen days and was captured on twenty-four-hour jail video, which drew the attention of both the FBI and the ACLU. The ACLU requested an

investigation by the Justice Department for what they deemed to be "systemic" problems with CCS' medical care at the jail.

137.    In June 2012, CCS employees working in the Wichita County Jail ignored Nicole Guerrero's obvious signs of labor and left her unattended in a solitary cell. CCS staff ignored her serious medical condition and ultimately refused to transport her to the hospital for safe delivery. The baby was pronounced dead shortly after birth. Like Mr. Lovern, as a result of CCS Defendant's deliberately indifferent customs and training, nurses did not address her critical medical situation in a timely or proper manner. The case settled for an undisclosed amount in November 2015. See *Guerrero v. Wichita County, Texas et al.*, Case No. 14-cv-0058 (N.D. Tex.).

138.    CCS made a $1,000,000 offer of judgment to the Estate of Farah Saleh Farah, a 24-year-old mentally ill man who died of dehydration in the Alexandria Detention Center in 2008, which Plaintiff accepted. Like Mr. Lovern, Mr. Farah died from a treatable condition because CCS nurses ignored his debilitated condition and refused to provide immediate medical attention and hospitalization.

139.    The history of CCS related Defendants has drawn the widespread attention of media sources in Colorado and nationwide, and also led to employees and governmental agencies speaking out against these demonstrated company practices.

140.    In 2017, Fulton County Jail in Georgia terminated its contract with CCS and MSM, a subcontractor of CCS, after five inmates died in the jail in a short period of time. The County stated that staffing problems of CCS and its subcontractor made them unable to adequately respond to emergencies.  Fulton's letter terminating the contract stated that the only

connection between the five deaths was that each inmate was "being medically treated by CCS/MSM."   https://www.myajc.com/news/local/county-end-morehouse-contract-for-inmate-care-after-die/Yl9HFCFVleAu8RT98wSjdL/   https://www.thedailybeast.com/prison-health-care-provider-sued-140-times-now-blamed-for-at-least-six-deaths?ref=scroll.

141.   Former CCS nurse employees have given interviews to various press sources about the company's custom of providing grossly deficient nursing care in their facilities. For example, a nurse who worked for CCS at the Brown County Jail in Green Bay, Wisconsin states that she had to quit CCS because she was being forced to violate her nursing license, stating: "If I was called into court, I couldn't say truthfully that I am providing good nursing care." This same nurse reports that sending a withdrawal patient to the hospital was strongly discouraged and the inmate would "need to be at the point where their vital signs were dropping, their internal organs were starting to become compromised."

http://www.motherjones.com/politics/2017/01/opioid-withdrawal-jail-deaths.

142.   On August 18, 2016, the US Justice Department announced that it would gradually phase out contracts with private prison providers, noting among other factors that "they do not provide the same level of safety and security" as those directly administered by the government. A review of inmate medical records by the *Nation* that focused on 11 immigrant only contract prisons, including one in west Texas where Correct Care Solutions was the medical provider, found "prison medical units repeatedly failing to diagnose patients correctly despite obvious and painful symptoms, as well as the use of under qualified workers pressed to operate at the borders of their legal scope of practice." The investigative report, published in February, also said the files showed "men dying of treatable diseases — men who very likely would have

survived had they been given access to adequate care." *Daniel v. Cook County*, 833 F. 3d 728

(7th Cir. 2016) (DOJ report documenting lack of timely medical appointments, follow-up care,

and complete, accurate, and systematically organized medical records at jail admissible to help

prove *Monell* liability in case based on constitutionally deficient medical care at jail).

## V.  CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983 – 8th Amendment**
**Deliberately Indifferent Medical Care**
(Plaintiff Estate against all Individual Defendants)

143.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set

forth herein.

144.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or
usage of any state or territory or the District of Columbia subjects or causes to be
subjected any citizen of the United States or other person within the jurisdiction
thereof to the deprivation of any rights, privileges or immunities secured by the
constitution and law shall be liable to the party injured in an action at law, suit in
equity, or other appropriate proceeding for redress . . .

145.    Denny Dale Lovern was a citizen of the United States and Defendants to this

claim are persons for the purposes of 42 U.S.C. § 1983.

146.    Each Defendant to this claim, at all times relevant hereto, was acting under color

of state law.

147.    Mr. Lovern was protected from deliberate indifference to his known serious

medical needs by the Eighth Amendment.

148.    There is no qualified immunity for private actors working in a jail.

149.    As a result of the allegations contained in this Complaint, Individual Defendants are liable under 42 U.S.C. § 1983 for the violation of Mr. Lovern's rights under the Eighth Amendment by acting with deliberate indifference to his serious medical needs and disregarding the excessive risks associated with his serious and life-threatening medical condition, despite being expressly aware of Plaintiff's known serious medical needs and obvious need for care for the same.

150.    The acts or omissions of these Defendants were the legal and proximate cause of Mr. Lovern's injuries, losses and death.

151.    As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff Estate has suffered injuries and losses entitling it to recover his compensatory and special damages, including for extreme physical pain and suffering before his death, loss of constitutional rights, and ultimately loss of life, all in amounts to be proven at trial.

152.    Plaintiff is also entitled to punitive damages against these Defendants, in that their actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of the deceased Denny Lovern.

153.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, pre-judgment interest and costs as allowable by federal law.

**SECOND CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983**
*Monell* **Liability – 8th Amendment**
(Plaintiff Estate against Defendant CCS and Arapahoe County Defendants)

154.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

155.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

156.    Mr. Lovern was a citizen of the United States and the entity Defendants to this claim are persons for the purposes of 42 U.S.C. §1983.

157.    Mr. Lovern was protected from deliberate indifference to his known serious medical needs by the Eighth Amendment.

158.    Defendant CCS is a private corporation that contracts with Arapahoe County to provide medical care and health services to inmates at ACDF.

159.    Arapahoe County Defendants are non delegably liable for the constitutional violations of the CCS Defendant.

160.    Defendant CCS, at all times relevant hereto, was acting under color of state law, as the functional equivalent of a municipality providing medical care to inmates.

161.    As a result of the allegations contained in this Complaint, Defendants hereto are liable under 42 U.S.C. § 1983 for maintaining deliberately indifferent policies, practices, customs and training that resulted in the violation of Mr. Lovern's Eighth Amendment right to adequate medical care.[1]

---

[1] Plaintiffs reserve the right to argue that the 10th Circuit case *Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 946 (10th Cir. 2005) was wrongly decided and that respondeat superior should apply to private entities in § 1983 actions. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 795 (7th Cir. 2014) ("For all of these reasons, a new approach may be needed for whether corporations should be insulated from respondeat superior liability under § 1983. Since prisons and prison medical services are increasingly being contracted out to private parties, reducing private employers' incentives to prevent their employees from violating inmates' constitutional rights raises serious concerns. Nothing in the Supreme Court's jurisprudence or the relevant circuit court decisions provides a sufficiently compelling reason to disregard the important policy considerations underpinning the doctrine of *respondeat superior*. And in a world of increasingly privatized state services, the doctrine could help to protect people from tortious deprivations of their constitutional right.")

162.    These Defendants knew that the aforementioned policies, practices, and customs posed a substantial risk of serious harm to inmates like Mr. Lovern, and it was obvious that such harm would occur.  Nevertheless, Defendants failed to take reasonable steps to alleviate those risks of harm. There is an affirmative causal link between the deliberate indifference of the individual health care workers towards Mr. Lovern's medical needs and the policies, practices, and customs described herein. All acts or omissions committed by Defendants were the direct and proximate result of Mr. Lovern's injuries and death.

163.    In the light of the duties assigned to individual healh care workers, the need for more or different training and supervision of them by Defendants was so obvious and so likely to result in constitutional violations that Defendants failure to do so was deliberately indifferent to the rights of the relevant public and a moving force in the injuries to Mr. Lovern.

164.    The unconstitutional acts and omissions of CCS were moving forces in the unconstitutional acts of the individual defendants.

165.    As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff Estate has suffered injuries and losses entitling it to recover his compensatory and special damages, including for extreme physical pain and suffering before his death, loss of constitutional rights, and ultimately loss of life, all in amounts to be proven at trial.

166.    Plaintiff is also entitled to punitive damages against CCS, in that their actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

167.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, pre-judgment interest and costs as allowable by federal law.

## THIRD CLAIM FOR RELIEF
### Wrongful Death
(Plaintiff Darla Dailey against Defendant CCS and Individual Nurse Defendants)

168.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

169.    Defendant CCS is a private corporation that contracts with Arapahoe County to provide medical care and health services to inmates at ACDF.

170.    CCS is vicariously liable for the negligent acts and omissions by their agents and/or employees, including but not limited to, Individual Defendants and other medical workers, whether or not they are defendants to this claim, including NP Ron Waits.

171.    CCS and Individual Defendants are private 'persons', not governmental actors, and are therefore not entitled to any immunity under the CGIA.

172.    At all times relevant to this action, Mr. Lovern was under the medical responsibility, care, and treatment of Defendants hereto.

173.    Individual Defendants and other individual medical workers at ACDF had a duty to provide care to inmates at ACDF, including Mr. Lovern.

174.    Individual Defendants and other individual medical workers at ACDF had a nurse-patient or nurse-practitioner-patient relationship with Mr. Lovern and were acting within the scope of their employment.

175.    With respect to their care and treatment of Mr. Lovern, Individual Defendants and other individual medical workers owed him a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of medical personnel in similar situations. Through their actions and omissions, Individual Defendants and other individual medical

workers breached their respective standards of care and were negligent in failing to properly assess, monitor, treat, and care for Mr. Lovern.

176.    These duties of care are informed by state law. Under C.R.S. § 16-3-401, "prisoners arrests or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment." The provision of adequate medical treatment and humane care is a statutory obligation.

177.    CCS also had a duty to implement reasonable policies and exercise reasonable care in the training of medical workers at ACDF. CCS breached its duty to exercise reasonable care in the training of medical workers in a manner that provided the inmates under their care with reasonable medical care and treatment.

178.    As a direct and proximate result of these Defendants' unlawful acts and omissions, Plaintiff Dailey has suffered damages, losses and injuries in an amount to be determined by the jury at trial. These damages include, *inter alia*, funeral expenses, pain and suffering, upset, grief, loss of society and companionship, anger, depression, and all other damages as allowed under the Colorado Wrongful Death Act.

179.    Plaintiff hereby gives notice that she likely will seek punitive damages under state law after completion of substantial discovery, as Defendants' conduct was attended by circumstances of malice, and willful and wanton conduct, which Defendants must have realized was dangerous, or that was done recklessly, without regards to the consequences to Mr. Lovern and the Plaintiff.

## PRAYER FOR RELIEF

Plaintiffs pray that this Court enter judgment for the Plaintiffs and against each of the

Defendants and enter the following relief:

A.     All available compensatory damages, including, but not limited to, all available damages for pain and suffering, physical, mental and emotional distress, loss of life, and all other non-economic and economic damages available under the law;

B.     Punitive damages on all federal claims as allowed by law and in an amount to be determined at trial against all individual defendants and corporate defendants;

C.     Punitive damages on state law claims upon suitable amendment after completion of substantial discovery;

D.     Attorneys' fees and costs;

E.     Pre- and post-judgment interest as appropriate; and

F.     Any further relief at law or equity that this Court deems just and proper.

**PLAINTIFFS RESPECTFULLY REQUEST TRIAL BY JURY.**

Respectfully submitted this 9th day of October, 2018.

*/s/ Anna Holland Edwards*
Anna Holland Edwards
Erica T. Grossman
Holland, Holland Edwards & Grossman, PC
1437 High Street
Denver, CO 80218
anna@hheglaw.com
erica@hheglaw.com
Phone:  (303) 860-1331
Fax:  (303) 832-6506

**CERTIFICATE OF REVIEW**

This is to certify that undersigned counsel has conferred, pursuant to Colorado statutes, with a person who has extensive expertise in the areas of alleged negligence and deliberate indifference to serious medical needs and that this professional has reviewed the known facts, including such records, documents, and other materials as he has found to be relevant to the complaint allegations of negligent acts and omissions, and has concluded that the filing of these claims do not lack substantial justification and in fact are substantially meritorious and involve clear violations of the standards of care involved.

/s/ *Anna Holland Edwards*
Anna Holland Edwards

38